2

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Feb 24, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KIMBERLY K,[1] | No.    1:20-cv-3173-EFS |
| Plaintiff, | |
| v. | **ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS AND DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF** |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security,[2] | |
| Defendant. | |

Plaintiff Kimberly K. appeals the denial of benefits by the Administrative Law Judge (ALJ).  Because the ALJ failed to provide clear and convincing reasons supported by substantial evidence for discounting Plaintiff's symptom reports, the Court grants Plaintiff's summary-judgment motion in part, grants the Commissioner's summary-judgment motion in part, reverses the ALJ's decision as to Plaintiff's Title XVI claims only, and remands this case for further proceedings.

---

[1] For privacy reasons, the Court refers to every social security plaintiff by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] On July 9, 2021, Ms. Kijakazi became the Acting Commissioner of Social Security. She is therefore substituted for Andrew Saul as Defendant. Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

# I.    Five-Step Disability Determination

A five-step sequential evaluation process is used to determine whether an adult claimant is disabled.[3]  Step one assesses whether the claimant is engaged in substantial gainful activity.[4]  If the claimant is engaged in substantial gainful activity, benefits are denied.[5]  If not, the disability evaluation proceeds to step two.[6]

Step two assesses whether the claimant has a medically severe impairment or combination of impairments that significantly limit the claimant's physical or mental ability to do basic work activities.[7]  If the claimant does not, benefits are denied.[8]  If the claimant does, the disability evaluation proceeds to step three.[9]

Step three compares the claimant's impairment or combination of impairments to several recognized by the Commissioner as so severe as to preclude substantial gainful activity.[10]  If an impairment or combination of impairments

---

[3] 20 C.F.R. §§ 404.1520(a), 416.920(a).

[4] *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[5] *Id.* §§ 404.1520(b), 416.920(b).

[6] *Id.* §§ 404.1520(b), 416.920(b).

[7] *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[8] *Id.* §§ 404.1520(c), 416.920(c).

[9] *Id.* §§ 404.1520(c), 416.920(c).

[10] *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 2

meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.[11]  If not, the disability evaluation proceeds to step four.

Step four assesses whether an impairment prevents the claimant from performing work he performed in the past by determining the claimant's residual functional capacity ("RFC").[12]  If the claimant can perform past work, benefits are denied.[13]  If not, the disability evaluation proceeds to step five.

Step five, the final step, assesses whether the claimant can perform other substantial gainful work—work that exists in significant numbers in the national economy—considering the claimant's RFC, age, education, and work experience.[14] If so, benefits are denied.  If not, benefits are granted.[15]

The claimant has the initial burden of establishing he is entitled to disability benefits under steps one through four.[16]  At step five, the burden shifts to the Commissioner to show the claimant is not entitled to benefits.[17]

---

[11] *Id.* §§ 404.1520(d), 416.920(d).

[12] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[13] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[14] *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Kail v. Heckler*, 722 F.2d 1496, 1497–98 (9th Cir. 1984).

[15] 20 C.F.R. §§ 404.1520(g), 416.920(g).

[16] *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

[17] *Id.*

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 3

## II.    Factual and Procedural Summary

On June 28, 2018, Plaintiff protectively filed an application for child's insurance benefits based on disability, a Title II application for a period of disability and disability insurance benefits, and a Title XVI application for supplemental security income; in each she alleged a disability onset date of January 1, 2011.[18]  Her claims were denied initially and upon reconsideration.[19] Administrative Law Judge S. Pines presided over the requested administrative hearing by telephone.[20]

In the written decision denying Plaintiff's disability claims, the ALJ found as follows:

- Insured Status—December 31, 2011, was Plaintiff's date last insured.[21]

- Step One—Plaintiff had not engaged in substantial gainful activity since January 1, 2011, the alleged onset date.[22]

- Step Two—Plaintiff had the following medically determinable severe impairments:

    o    anxiety,

    o    panic disorder, and

---

[18] AR 15.

[19] AR 15, 56, 63, 83.

[20] AR 15–26.

[21] AR 18.

[22] AR 18.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 4

    ○  trauma disorder.[23]

- Step Three—Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.[24]

- RFC—Plaintiff had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations:
  - ○ "limited to simple routine work"
  - ○ "in a workplace with no more than occasional workplace changes"
  - ○ "can have occasional contact with supervisors"
  - ○ "can have occasional superficial contact with coworkers"
  - ○ can have "brief, superficial contact with the public"[25]

- Step Four—There was insufficient evidence to make a definitive finding regarding past relevant work, but it did not matter because Plaintiff's RFC allowed for the performance of other work at Step Five.[26]

- Step Five—Considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as (1) cleaner, housekeeping (DOT 323.687.014,

---

[23] AR 18.

[24] AR 18–19.

[25] AR 19–24.

[26] AR 24–25.

1

light/svp 2); (2) inspector, hand packager (DOT 559.687-074, light/svp 2);

2

and (3) kitchen helper (DOT 318.687.010, medium/svp 2).[27]

3

The ALJ concluded Plaintiff had not been under a disability, as defined in

4

the Social Security Act ("the Act"), from January 1, 2011, through June 3, 2020.[28]

5

Plaintiff requested review of the ALJ's decision by the Appeals Council, which

6

denied review.[29]  Plaintiff then timely appealed to this Court, primarily challenging

7

the ALJ's analysis and findings regarding certain medical opinions and symptom

8

reports by Plaintiff.

9

### III.    Standard of Review

10

A district court's review of the Commissioner's final decision is limited.[30]

11

The Commissioner's decision is set aside "only if it is not supported by substantial

12

evidence or is based on legal error."[31]  Substantial evidence is "more than a mere

13

scintilla but less than a preponderance; it is such relevant evidence as a reasonable

14

mind might accept as adequate to support a conclusion."[32]  Moreover, because it is

15

the role of the ALJ and not the Court to weigh conflicting evidence, the Court

16

17

───────────────

18

[27] AR 25.

19

[28] AR 26.

20

[29] AR 1–3.

21

[30] 42 U.S.C. § 405(g).

22

[31] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

23

[32] *Id.* at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

upholds the ALJ's findings "if they are supported by inferences reasonably drawn from the record."[33]  The Court considers the entire record as a whole.[34]

Further, the Court may not reverse an ALJ decision due to a harmless error.[35]  An error is harmless "where it is inconsequential to the ultimate nondisability determination."[36]  The party appealing the ALJ's decision generally bears the burden of establishing harm.[37]

### IV.    Applicable Law & Analysis

Plaintiff alleges the ALJ erred by improperly rejecting Plaintiff's symptom reports as well as by rejecting the opinions of certain treating and examining providers.[38]

### A.    Plaintiff's Title II & Child-Disability-Benefit Claims: Denial Affirmed

As a preliminary matter, although Plaintiff states that she is appealing the "denial of her Title II, XVI, and Child Disability Benefit claims," she does not

---

[33] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

[34] *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up).

[35] *Molina*, 674 F.3d at 1111.

[36] *Id.* at 1115 (cleaned up).

[37] *Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009).

[38] *See, generally*, ECF No. 13 ("Plaintiff's MSJ").

assert any substantive arguments regarding either her Title II claim or her Child's-Insurance-Benefits claim.[39]  The Commissioner points out that Plaintiff "does not challenge the ALJ's findings denying those claims" and asserts that "in reality, this action challenges only the Title XVI application findings."[40]  Notably, Plaintiff has not disputed this assessment.[41]

The ALJ correctly stated as follows:

> For the Title 2/Disability Insurance Benefits claim, the issue is whether the claimant established disability on or before the date last insured (December 31, 2011). The earliest treatment evidence in the file is from 2017. Therefore, the evidence does not support the allegation of disability on or before the date last insured.
> For the Title 2/Child's Insurance Benefits claim, the issue is whether the claimant has a disability that began before attainment of age 22 (November 29, 2011). The earliest treatment evidence in the file is from 2017. Therefore, the evidence does not support the allegation of disability beginning before attainment of age 22.

Even an inferred onset date must have "a supportable medical basis and be consistent with the nature of the condition."[42]  Aside from Plaintiff's own assertions, the only evidence in the record suggesting that Plaintiff might have been disabled in 2011 comes in the form of a March 2020 check-box form in which Plaintiff's therapist and medication manager checked "yes" to a question asking whether Plaintiff's then-current limitations "existed since at least January 1,

---

[39] Plaintiff's MSJ at 1. *See also, generally, id.*

[40] ECF No. 15 ("Defendant's MSJ") at 2 n.1.

[41] *See* ECF No. 16 ("Plaintiff's Reply").

[42] Soc. Sec. Admin. Program Operation Manual System (POMS) DI 25501.450.

2011."[43]  This isolated, unexplained medical opinion—authored about nine years after the period in question—was insufficient to establish a disability onset date back in 2011.[44]  Accordingly, the Court affirms the ALJ's denial of Plaintiff's Title II claim and Child's-Insurance-Benefits claim.

**B.  Plaintiff's Symptom Reports: Plaintiff establishes consequential error.**

Plaintiff first contends that the ALJ "reversibly erred by rejecting [Plaintiff]'s symptom testimony for reasons that were not clear and convincing."[45] For the reasons discussed below, the Court agrees.

The core of Plaintiff's disability claim stems from symptoms related to posttraumatic stress, anxiety, and panic attacks.[46]   As a child, Plaintiff's

---

[43] AR 868.

[44] *See* 42 U.S.C. § 423(5)(A); *Sam v. Astrue*, 550 F.3d 808, 810 (9th Cir. 2008); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009); *Crane v. Shalala,* 76 F.3d 251, 253 (9th Cir. 1996); *see also Lair-Del Rio v. Astrue*, 380 F. App'x 694, 695 (9th Cir. 2010) (unreported) ("[T]he record is devoid of any medical records from the relevant period—between her claimed onset date . . . and her date last insured . . . that would meet her burden to establish a disability. . . . [R]etrospective [medical opinions], written months and years after the relevant time period, are unpersuasive.").

[45] Plaintiff's MSJ at 8.

[46] *See, e.g.*, AR 39, 41, 43–47, 269.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 9

stepfather physically and emotionally abused both Plaintiff and her mother.[47]   In

late summer of 2017, Plaintiff sought treatment for anxiety-related symptoms,

reporting that she had lost her job because of her anxiety and panic attacks.[48]  She

said she frequently suffered panic attacks that interfered with her ability to work,

and she described them as causing feelings of walls closing, a racing heartbeat,

racing thoughts, and shortness of breath.[49]

Plaintiff received diagnoses of posttraumatic stress disorder (PTSD) and

anxiety disorder.[50]  From her initial assessment in September 2017 through the

date of the administrative hearing in May 2020, Plaintiff attended therapy—

usually on a weekly basis—and took various prescribed medications aimed at

treating her mental health problems.[51]

1.  The ALJ was required to provide specific, clear, and convincing reasons
    for rejecting Plaintiff's symptom reports.

In analyzing Plaintiff's symptom reports, the ALJ found Plaintiff's

"statements concerning the intensity, persistence and limiting effects of these

---

[47] AR 266, 283, 540–41, 745.

[48] AR 209, 464,

[49] *See, e.g.*, AR 205, 262, 771, 745.

[50] *See, e.g.*, AR 264, 268, 278, 403, 464, 543, 545, 562, 620, 746, 792, 862.  For

purposes of this order, the term "anxiety disorder" also refers to the similar

diagnoses of panic disorder (episodic paroxysmal anxiety). *See id.*

[51] *See generally* AR 254–869 (Plaintiff's medical records).

symptoms are not entirely consistent with the medical evidence and other evidence in the record."[52]  As there was no evidence of malingering, the ALJ was required to provide "specific, clear and convincing" reasons supported by substantial evidence for rejecting Plaintiff's symptom reports.[53]

2. <u>The ALJ did not specify which of Plaintiff's symptom reports were being rejected based on the supposed inconsistencies.</u>

In her decision, the ALJ highlighted activities and medical records she perceived as inconsistent with Plaintiff's symptom reports.[54]  Yet, the ALJ did not articulate which symptom reports were at issue or how they conflicted with the cited evidence; the ALJ instead broadly stated that the symptom reports at issue were "statements about the intensity, persistence, and limiting effects of her symptoms."[55]  "[T]his boilerplate statement . . . which is routinely included in ALJ decisions denying benefits, did not 'identify what parts of the claimant's testimony

---

[52] AR 20.  *See also*, *Molina*, 674 F.3d at 1112 (describing the two-step analysis applicable when analyzing a claimant's symptom reports).

[53] *See Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1036).

[54] *See* AR 21–22.

[55] AR 21.

were not credible and why.'" The ALJ therefore committed legal error by failing to allow for meaningful review of the credibility analysis.[56]

> 3. The ALJ did not provide context by which the Court could reasonably infer which of Plaintiff's symptom were rejected.

Even if the Court were to overlook the ALJ's failure to provide an adequate explanation, the ALJ's decision lacks sufficient analysis and context for the Court to reasonably infer which symptom reports were rejected or how they were inconsistent with other evidence. For instance, Plaintiff testified that her panic attacks were sometimes so severe that they were "crippling," and they affected her ability to perform work because it could be difficult to even get up or speak.[57] She testified that she usually could not predict when a panic attack would strike.[58] And, throughout her years of therapy, Plaintiff reported frequencies ranging from a low of about 2–3 panic attacks per week to a high of 5–10 panic attacks per week.[59]

---

[56] *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020) (cleaned up) (quoting *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014)); *see also Treichler*, 775 F.3d at 1103 ("The ALJ must identify the testimony that was not credible, and specify 'what evidence undermines the claimant's complaints.'" (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998))).

[57] AR 39, 43.

[58] AR 42.

[59] AR 262 (January 2018, reporting around two panic attacks per week); AR 777 (April 2019, reporting 5–10 per week); AR 553 (October 2018, reporting 20 panic

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 12

During that same time, she has reported her panic attacks as lasting anywhere from just a few minutes to a full hour.[60]

Despite this, the ALJ provided no analysis or findings regarding what a typical panic-attack event would entail, how long it would last on average, or how and when such symptoms varied over time.[61]  Nor did the ALJ discuss what impact, if any, Plaintiff's panic attacks were likely to have on factors such as her rate of absenteeism or off-task time in a workplace environment throughout the years.  Put simply, the ALJ's decision lacks any means of determining whether—or to what extent—the ALJ discounted Plaintiff's various statements regarding her panic-attack symptoms.  The same is true for Plaintiff's various other symptom reports.

---

attacks in the prior month); AR 830–31 (October 2019, reporting 3–4 per week); AR 843 (December 2019, reporting 2–3 per week); AR 854 (February 2020, reporting 2–3 per week).

[60] AR 205, 564, 771, 854.

[61] *See Smith v. Kijakazi*, 14 F.4th 1108, 1112 (9th Cir. 2021) ("The ALJ discredited [the claimant]'s testimony as a whole, but her decision does not sufficiently consider the duration of, or chronological fluctuation in, [the claimant]'s symptoms.").

4. <u>The ALJ erred in discounting Plaintiff's symptom reports based on Plaintiff's reported daily activities.</u>

The ALJ committed further harmful error by finding Plaintiff's symptom reports were inconsistent with her reported daily activities. In discounting Plaintiff's symptom reports, the ALJ stated the following:

> The claimant's statements about the intensity, persistence, and limiting effects of her symptoms are not wholly consistent with her daily activities. The claimant takes care of her son. Despite panic attacks and social anxiety, the claimant takes her son to the library. She went camping, even though this required spending time with new people. The claimant started dating. She testified about going shopping with a friend. Additionally, the claimant has cared for her mother during a period of declining health.[62]

In appealing the ALJ's decision, Plaintiff rightly asserts that none of the activities identified by the ALJ contradict her testimony of "frequent, unpredictable panic attacks and persistent anxiety."[63]

a. <u>A claimant may be disabled and still engage in a variety of activities; the ALJ must consider the nature of each activity and whether it is truly inconsistent with the symptoms reported.</u>

Naturally, an ALJ may properly consider evidence that a claimant has engaged in activities that tend to undermine her reported symptoms—particularly

---

[62] AR 21 (internal record citations omitted).

[63] Plaintiff's MSJ at 9.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 14

1   when claimed limitations stem from reported pain.[64]  However, ALJs must keep in

2   mind that a claimant need not be "utterly incapacitated" in order to be disabled,

3   and a disabled individual should not be penalized for trying to lead as close to a

4   "normal" life as her disability allows.[65]

5        To undermine a claimant's credibility, the activity in question must actually

6   contradict the claimant's symptom reports and/or involve spending a "substantial"

7   part of the day using skills that are transferable to a work setting.[66]  Courts in this

8   Circuit have "repeatedly asserted that the mere fact that a [claimant] has carried

9   on certain daily activities, such as grocery shopping, driving a car, or limited

10  walking for exercise, does not in any way detract from her credibility as to her

11  overall disability."[67]  Thus, to allow for meaningful review—and ensure that a

12  claimant's reported activities are not unfairly held against her—an ALJ "must

13

    _____

14  [64] *See, e.g., Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("[I]f, despite his claims

15  of pain, a claimant is able to perform household chores and other activities that

16  involve many of the same physical tasks as a particular type of job, it would not be

17  farfetched for an ALJ to conclude that the claimant's pain does not prevent the

18  claimant from working.").

19  [65] *Id.*; *see also Reddick*, 157 F.3d at 722 ("Several courts, including this one, have

20  recognized that disability claimants should not be penalized for attempting to lead

21  normal lives in the face of their limitations.").

22  [66] *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

23  [67] *Id.*

    ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 15

make specific findings relating to the daily activities and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination."[68]

Here, the ALJ pointed to a few "daily activities" that she found to be inconsistent with Plaintiff's reports regarding the intensity, persistence, and limiting effects of her symptoms.  The Court addresses each activity below.

> b. _Caring for Family Members: Substantial evidence does not support the ALJ's finding._

As to Plaintiff caring for her son and mother, aside from mentioning that Plaintiff took her son to the library, the ALJ failed to articulate which activities were supposedly inconsistent with Plaintiff's symptom reports.  The ALJ likewise failed to explain how any of Plaintiff's reported activities, including taking her son to the library, were either inconsistent with her other statements or demonstrated skills transferable to a work setting.[69]  While an ALJ might reasonably infer that caring for a family member involves responsibilities that are generally inconsistent

---

[68] _Orn_, 495 F.3d at 639 (cleaned up) (quoting _Burch v. Barnhart_, 400 F.3d 676, 681 (9th Cir. 2005)).

[69] _See id._ (cleaned up) (quoting _Burch_, 400 F.3d at 681). _Cf. also Burch_, 400 F.3d at 681 (upholding denial that was based in part on determining that the claimant performed daily activities that were transferable to a work setting).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 16

with many common *physical* limitations[70]—or even certain mental limitations—the same is not necessarily true for anxiety-based limitations, which are highly individual in nature and are frequently linked to external factors such as the physical or social environment.[71]  When a claimed impairment is tied to stress and mental illness, the Social Security Administration has recognized the "importance of thoroughness in evaluation on an individualized basis," saying the following:

> Individuals with mental disorders often adopt a highly restricted and/or inflexible lifestyle within which they appear to function well. Good mental health services and care may enable chronic patients to function adequately in the community by lowering psychological pressures, by medication, and by support from services such as outpatient facilities, day-care programs, social work programs and similar assistance.
> The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. . . . A person may become panicked and develop palpitations, shortness of breath, or feel faint while riding in an elevator; another may experience terror and begin to hallucinate when approached by a stranger asking a question. Thus, the mentally impaired may have difficulty meeting the requirements of even so-called "low-stress" jobs.
> Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job.[72]

Here, the ALJ seemingly ignored the individualized nature of Plaintiff's mental-disorder impairments.  In contrast to a work-like setting, Plaintiff reported

---

[70] *Cf. Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (The ALJ "is entitled to draw inferences logically flowing from the evidence.").

[71] *See* Social Security Ruling (SSR) 85-15 at *6 (1985).

[72] *Id.*

performing family-care duties—mostly unspecified—within the controlled and accommodating environment of her own home.[73]  She could literally "feel at home" while caring for the two people with whom she was closest.   Courts have frequently recognized that "many home activities are not easily transferable to what may be the more grueling environment of the workplace."[74]  But the ALJ provided no explanation regarding which home activities were at issue or how they showed an ability to perform work activities in a work environment.

None of Plaintiff's symptom reports are truly inconsistent with any of her reported care activities, including acting as her son's primary caregiver.[75]  Rather, the opposite appears true.  For example, *consistent* with her symptom reports, Plaintiff described needing her mother's help with caring for her son about 1–3 times per week because of panic attacks.[76]  Plaintiff's family-care activities, so far as they are described in the record, are not clear and convincing reasons for rejecting her symptom reports, and the ALJ erred in finding otherwise.

a.    *Plaintiff's rare public outings were consistent with her symptom reports.*

Plaintiff stated that she would occasionally leave the comfort and familiarity of home to take her son to the library or go grocery shopping, usually with a close

---

[73] *See, e.g.*, AR 43, 264, 268, 291, 486, 746.

[74] *Fair*, 885 F.2d at 603.

[75] AR 43.

[76] AR 43–44.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 18

friend.[77]  Again, the ALJ's decision leaves unclear how these activities contradict any of Plaintiff's symptom reports.  Plaintiff never claimed to be utterly incapable of going out in public; she instead consistently reported that it was *difficult* to go out in public—especially if there was likely to be lots of strangers—because such outings were stressful and increased the likelihood of panic attacks.[78]  Plaintiff described possessing a high level of control over whether, when, and how she engaged in public outings.[79]  For both the library and the grocery store, Plaintiff could choose not to go, take a break, or leave early, depending on her symptoms at the time.

Far from being daily activities, Plaintiff's reported ventures into public spaces were brief and infrequent.  Even then, she was almost always accompanied by one of the few people she trusted, and she still reported experiencing anxiety,

---

[77] *See, e.g.*, AR 304.

[78] *See, e.g.*, AR 209 (reporting difficulty going to the grocery store and choosing times when fewer people will be there); AR 262 ("[B]eing in public is also a trigger for her but her panic attacks can occur without triggers."); AR 599 (listing several of Plaintiff's triggers as including, among other things, loud noises, people arguing, crowded places, and being in a small space for too long).

[79] *See, e.g.*, AR 802 (describing some coping mechanisms used); *id.* at 813 (making a plan with her therapist as to how to go grocery shopping by herself despite the high level of associated anxiety).

sometimes needing to take breaks to prevent or stop panic attacks.[80]   It is therefore unclear why the ALJ considered Plaintiff's rare outings to be inconsistent with any of her symptom reports, much less those regarding frequency and severity.  For example, nothing about Plaintiff pushing herself to occasionally go to the library and grocery store contradicts her reports of anxiety and suffering panic attacks several times per week.  Nor do they conflict with Plaintiff's reports that during a panic attack she could feel as though the walls were closing in and experience a racing heart, racing thoughts, sweaty palms, and/or shortness of breath.[81]  Accordingly, Plaintiff's limited public outings indicated in the record were not a valid basis for discounting her symptom reports.

> b.  _Plaintiff's limited social activities were consistent with her symptom reports._

The same flaws as those discussed above apply to the ALJ's use of Plaintiff's single camping trip and limited dating activities to discount her symptom reports.[82]  Just as with Plaintiff's general caretaking activities and her limited public outings, nothing about Plaintiff's social life appears inconsistent with her statements

---

[80] AR 802 (Plaintiff reporting a rare instance in which she went to the grocery store _without_ a friend, during which she "made it through" only after taking a break in the bathroom, splashing water on her face, and using a tapping coping technique.)

[81] _See, e.g._, AR 205, 262, 771, 745.

[82] _See_ AR 21.  Additionally, the rare reports of Plaintiff dating and the single instance of camping are not "daily activities."

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 20

regarding the severity or frequency of her symptoms.[83]  In choosing her limited

social activities, Plaintiff again had complete control over whether, where, and how

she met with people.  The overall record shows that her social circle was limited to

family, a few close friends, and occasionally a boyfriend.[84]  And Plaintiff

consistently reported that she suffered from increased anxiety related to dating,

meeting new people, and even socializing with family members.[85]  A person may

suffer from anxiety and panic attacks, even to a disabling degree, without

necessarily being a complete recluse.[86]

There are few reports in the record of Plaintiff engaging in social activities,

and fewer still which describe the nature of the activity beyond vague terms such

---

[83] The ALJ also points to Plaintiff "going shopping with a friend," seemingly

viewing it as a social activity inconsistent with Plaintiff's symptom reports. *See*

AR 21.  However, as discussed further above, the shopping reported by Plaintiff

was for groceries, and she brought her close friend for support with her anxiety.

*See, e.g.*, AR 802.  There is no indication it was done for fun or for the primary

purpose of meeting with her friend.

[84] *See, e.g.*, AR 269, 426, 803; *see also* AR 541 (Plaintiff reporting her mother as her

best friend).

[85] *See, e.g.*, AR 426, 430, 566, 757, 813.

[86] *See Fair*, 885 F.2d at 603 (a claimant need not be "utterly incapacitated" to be

disabled).

as "socializing."[87]  Further, for those rare instances in which the activities *were* described with some specificity, the record shows they were subject to limits and precautions that reflect—not contradict—Plaintiff's symptom reports.  For example, Plaintiff would generally limit meeting new people to one at a time, she "hung out" with her boyfriend within the comfort of her own home, and the record does not suggest that Plaintiff ever did anything further outside her comfort zone than going camping with several family members.[88]  Notably, that camping trip was Plaintiff's first ever and took place about two years into her course of treatment.[89]

Contrary to the ALJ's findings, the social activities that are described in the record are fully consistent with her "statements about the intensity, persistence, and limiting effects of her symptoms."[90]  The ALJ failed to explain how *any* of Plaintiff's social activities contradicted *any* of her statements, let alone how specific

---

[87] *See. e.g.*, AR 301, 426.

[88] AR 759 ("She said he came to her house and they talked and ate dinner."); AR 802 ("[Plaintiff] said she has never been camping and she normally wouldn't have went camping.  [She] said she had anxiety, but still went and experienced it.  The camping and meeting new people was out of her comfort zone, but overall she said it went well."); AR 803 (complying with therapist's recommendation by pushing herself to go to a friend's house and meet one new person).

[89] AR 802 (reporting in July 2019 going camping for the first time).

[90] *See* AR 21.

1  activity contradicted specific symptom reports.  The ALJ thus failed to provide the

2  requisite "'specific, clear, and convincing" reasons supported by substantial

3  evidence for rejecting Plaintiff's symptom reports.[91]

4     5.  <u>The ALJ erred in finding Plaintiff's improvement was inconsistent with</u>

5         <u>her symptom reports.</u>

6     The ALJ also repeatedly cited Plaintiff's improvement over the years as a

7  basis for discounting her testimony.[92]  The ALJ referred broadly to reports of

8  improvement in the treatment records, Plaintiff's coping skills, and her "greater

9  ability to socialize over time, as she went camping, took her son to the library,

10 spent time with another parent, and began dating."[93]  As discussed above, the

11 latter social abilities were in no way inconsistent with Plaintiff's symptom reports,

12 but they do indicate at least some level of improvement.  However, the nature,

13 extent, and significance of any improvement is left unexplained.

14

15

---

16 [91] *See Ghanim*, 763 F.3d at 1163 (quoting *Lingenfelter*, 504 F.3d at 1036).  "General

17 findings are insufficient;" rather, the ALJ must identify what symptom claims are

18 being discounted and what evidence undermines these claims. *Id.* (quoting *Lester v.*

19 *Chater*, 81 F.3d 821, 834 (9th Cir. 1995)); *Thomas v. Barnhart*, 278 F.3d 947, 958

20 (9th Cir. 2002) (requiring the ALJ to sufficiently explain why she discounted

21 claimant's symptom claims).

22 [92] AR 21–23 (internal record citations omitted).

23 [93] AR 21–23.

a.  *Whether a claimant's improvement undermines her disability*
    *claim depends on whether, and when, her symptoms no longer*
    *meet the Act's definition of disability.*

When evaluating symptom reports, ALJs are directed to consider the effect that medication and other forms of treatment have on a claimant's symptoms.[94] Additionally, the ALJ must "sufficiently consider the duration of, or chronological fluctuation in, [the claimant]'s symptoms."[95]  A claimant may have been disabled for a qualifying portion of the time, even if not for the full period leading up to the administrative hearing.[96]  This means that a claimant's symptom reports cannot be discredited as a whole because of changes over time or inconsistencies relevant only to statements describing a certain period.[97]

"That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace."[98]  Reports of

---

[94] 20 C.F.R. § 416.929(c)(3)(iv)-(v); *id.* at § 404.1529(c)(3)(iv)-(v); *see Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) (a favorable response to treatment can undermine a claimant's complaints of debilitating pain or other severe limitations).

[95] *Smith*, 14 F.4th at 1112.

[96] *Id.* at 1114.

[97] *Id.* at 1112.

[98] *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 24

improvement in mental health "must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms" as well as with an awareness that "improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace."[99]  Without more, general references to improvement are insufficient to render repeatedly reported symptoms "inconsistent" and so not credible.[100]  To undercut a claimant's credibility and/or her disability claim, the improvement in question must be of the kind and degree that brings her symptoms outside the Act's definition of disability.[101]  The ultimate question is "whether the severity of the problem had decreased sufficiently to enable [her] to engage in gainful activity."[102]

> b.  *The record shows, and Plaintiff freely acknowledged, that treatment significantly helped with her symptoms.*

Here, Plaintiff acknowledged at the hearing that she had noticed definite improvement during the past "year or two."[103]  She said the medications have helped, but since the start and continuing to the date of the hearing, her

---

[99] *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) (cleaned up).

[100] *See Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1200–01 (9th Cir. 2008).

[101] *See id.*; *Holohan*, 246 F.3d at 1205.

[102] *See Warre*, 439 F.3d at 1006 (discussing the issue of medical improvement in the context of terminating benefits for a prior-established disability).

[103] AR 45.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 25

1   medication regimen was "still kind of a little trial-and-error," with her doctor

2   altering her medication combinations and seeing how she reacted.[104]  Plaintiff

3   concluded at the hearing that she was feeling better than before, but her

4   medication regimen was still "not quite where [she] would want it to be."[105]  This

5   testimony is consistent with the medical records.[106]

6                    i.    *2017: Beginning of Treatment Records*

7        The earliest treatment records provided are from 2017.[107]  Starting in late

8   August 2017, treatment records show Plaintiff reported feeling "very anxious" and

9   she was suffering about 2–3 panic attacks per week.[108]  During the initial

10  assessment conducted by Central Washington Comprehensive Mental Health,

11  Plaintiff's Patient Health Questionnaire (PHQ) score indicated mild depression,

---

13  [104] AR 46.

14  [105] AR 46.

15  [106] *See, e.g.*, AR 293 (March 2018, increasing anxiety medication dosage); AR 790

16  (May 2019, stopping one anxiety medication, starting a new one, and starting a

17  sleep medication); AR 824 (October 2019, starting trial of a new sleep medication);

18  AR 860 (February 2020, adjusting sleep medications).

19  [107] This is despite Plaintiff's claimed onset date of January 1, 2011, and references

20  in the record to Plaintiff being seen by crisis services in 2005, completing an intake

21  assessment in June 2008, and receiving counseling in 2011. *See, e.g.*, AR 263, 266,

22  540.

23  [108] AR 269, 618, 719.

her General Anxiety Disorder (GAD) score indicated moderate anxiety, and her PTSD Checklist (PCL) score was clinical for PTSD.[109]  Throughout the rest of the year, each of those scores fluctuated significantly.[110]  For instance, shortly after beginning treatment, Plaintiff's GAD score dropped, first to non-clinical and then to mild for anxiety.[111]  However, referring to these comparatively low scores, Plaintiff's therapist noted, "I think there was underreporting based on [Plaintiff]'s verbal reports and presentation."[112]

### ii.    *2018: Varying Symptoms & Concerns of Underreporting*

In early 2018, Plaintiff said she felt her new medication was helping and her mood had been "better."[113]  Notably, shortly thereafter, Plaintiff discovered her uncle deceased in his home.[114]  When Plaintiff's GAD score indicated mild anxiety and she scored non-clinical for PTSD, Ms. Morgan again said, "I think these scores indicate gross underreporting based on [Plaintiff]'s presentation and recent trauma of finding her uncle's dead body."[115]  Then, over the course of 2018, Plaintiff reported needing to use the coping method of mindful breathing at least 10 times

---

[109] AR 266.

[110] *See, e.g.*, AR 274, 304 306, 617–18.

[111] AR 304, 306.

[112] AR 306.

[113] AR 301.

[114] AR 864.

[115] AR 285, 299.

per day, with the frequency of her panic attacks ranging from just a few per week to over 20 in a month.[116]  Her scores relating to anxiety, PTSD, and depression each varied significantly, with her GAD scores in particular ranging from mild to severe.[117]

Also in 2018, on several occasions, treatment providers expressed further concerns that Plaintiff was continuing to underreport her symptoms:

- April 2018, "I do think [Plaintiff] minimizes or is not aware of her level of depression and anxiety as I assess her as much more depressed and anxious than indicated on these assessments."[118]

- March 2018, "I asked about the PHQ and GAD scores since she seems to minimize her symptoms on paper, but [she] is easily triggered to tears when we discuss things."[119]

---

[116] AR 287.

[117] AR 615–16 (April 2018, GAD score reflecting moderate anxiety); AR 426 (June 2018, GAD for mild anxiety); AR 420 (July 2018, GAD for moderate anxiety); (August 2018, GAD for severe anxiety and PHQ-9 score for moderate depression); AR 570 (September 2018, progress on reducing anxiety and panic attacks, but continued work needed); AR 575 (September 2018, "anxiety has improved with lorazepam."); AR 545 (October 2018, reporting 20 panic attacks in the last month but also noting "progress based off her GAD-7 score"); AR 566 (same);

[118] AR 283.

[119] AR 297.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 28

1

2
- Later in March 2018, "Again, I think [Plaintiff] is underreporting as she was tearful and expressed feeling very stressed." [120]

3

4
- July 2018, "I believe she doesn't feel she deserves to complain, thus doesn't express how anxious she feels[,] especially on paper."[121]

5

6

7

8

9
- August 2018, "I told her I wondered if she was filling it out correctly, because based on how you present and report I would expect your anxiety score to be higher. . . . These scores [upon retesting with further instruction] would reflect that progress has not been made on [decreasing anxiety and panic attacks]."[122]

10
### iii.    2019–2020: Some Level of Sustained Improvement

11

12

13

14

15
In early 2019, Plaintiff reported her panic attacks were "probably a little better."[123]  Similarly, the records for the rest of 2019 show significant variation in symptoms, with Plaintiff reporting some improvement in the severity and duration of her panic attacks but no change in their frequency.  Below are excerpts from some of the relevant treatment notes:

16

17
- February 2019, "still having panic attacks and they are the same[,] but she said she is able to control them better than before."[124]

18

---

19
[120] AR 291.

20
[121] AR 424.

21
[122] AR 486.

22
[123] AR 757.

23
[124] AR 759.

- March 2019, "some improvement on [anxiety and panic attacks] as she does a good job at using her coping skills to get through situations such as a panic attack and health."[125]

- April 2019, "continues to experience frequent anxiety and panic attack symptoms that have not consistently decreased in frequency for panic attacks and her overall anxiety continues to occur daily."[126]

- May 2019, "She said she has had panic attacks for a couple days that were out of control."[127]

- June 2019, "GAD-7 scores from December 2018 to present that showed she has consistently been at mild anxiety, which shows stability for [Plaintiff] in her anxiety."[128]

- August 2019, "As for her anxiety, she states she . . . still has occasional break through anxiety and has found the Buspar to be very helpful in alleviating her symptoms."[129]

- September 2019, "when she has her panic attacks the one tab of Lorazepam is not seeming to be as effective as it was in the past."[130]

---

[125] AR 469.

[126] AR 776.

[127] AR 795.

[128] AR 800.

[129] AR 804.

[130] AR 820.

- October 2019, "Increase in panic attacks, only change is she hasn't been sleeping."[131]

- December 2019, "she states she has had a notable decrease in anxiety attacks since last visit where the dose was adjusted . . . . [Plaintiff] continues to find the Buspar to be very helpful as well in alleviating her symptoms."[132]

Then, by early 2020, Plaintiff's treatment records indicate she was "stable in her anxiety and depression."[133]  She reported fewer panic attacks, saying they were "still there" but she thought "they are better than what they have been."[134]  She reported 2–3 panic attacks per week, though shortened in duration to about 5–10 minutes.  Shortly before the administrative hearing, in late-February 2020, Plaintiff stated that "[o]verall, . . . she is doing better," though she also reported "a mild increase of anxiety over the last several weeks," which she attributed to the recent therapy work she had done to address her trauma.[135]

c.  _The ALJ's decision leaves unclear when, if ever, Plaintiff's symptoms improved to the point she could no longer qualify for disability._

---

[131] AR 828.

[132] AR 835.

[133] AR 847.

[134] AR 850.

[135] AR 855.

The record indicates that Plaintiff's symptoms—particularly her panic-attack symptoms—varied significantly, but that they generally improved over the course of more than two years of attending counseling sessions and taking prescribed medications.   Nonetheless, "[t]he ALJ's decision does not adequately address this progression as it relates to [Plaintiff]'s credibility."[136]  Summarizing some of Plaintiff's reported symptoms and then stating that her symptoms improved with treatment did not satisfy the ALJ's duty to provide clear and convincing reasons for discrediting those symptom reports.[137]

Despite relying heavily on improvement to discredit Plaintiff's symptom reports generally, the ALJ never distinguished or otherwise compared Plaintiff's early symptoms with her later symptoms.  Indeed, the ALJ provided no meaningful analysis of how Plaintiff's symptoms improved over time.  As such, the ALJ's decision not only leaves unclear the extent of Plaintiff's improvement, but it also fails to establish when, if ever, Plaintiff's symptoms no longer met the Act's severity requirements.[138]  The ALJ reversibly erred by discounting Plaintiff's

---

[136] *Smith*, 14 F.4th at 1113.

[137] *See Lambert*, 980 F.3d at 1278.

[138] The ALJ's decision does not state whether Plaintiff's symptoms ever met the Act's severity requirements, but, logically, improvement would be relevant only if the symptoms were at some point sufficiently severe.

symptom reports without describing the nature, extent, or timing of Plaintiff's improvement or how such improvement contradicted Plaintiff's claims.[139]

## C.    Other Issues Raised: Impacted by Error

Plaintiff also raises issues with the ALJ's discounting of opinion evidence from treating provider Mona Morgan, LMHC, examining provider David Morgan, PhD, and treating therapist Lacy Villamar, licensed clinical social worker associate.[140]  The Court need not address these issues because the error as to Plaintiff's own symptom reports necessarily impacted the ALJ's treatment of other record evidence.  Similarly, because the ALJ's decision contains legal error, the Court cannot ascertain whether substantial evidence supports the ALJ's assessment of Plaintiff's RFC.

The Court declines to apply the credit-as-true rule, because it is far from certain that if the errors identified were corrected the ALJ would be required to find Plaintiff legally disabled.[141]  Additionally, even if Plaintiff's disability were

---

[139] *See Lambert*, 980 F.3d at 1278 ("Because the ALJ did not provide enough 'reasoning in order for us to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence,' we cannot treat the error as harmless." (quoting *Treichler*, 775 F.3d at 1103)); *see also Wade v. Saul*, 850 F. App'x 568, 569 (9th Cir. 2021) (unreported).

[140] Plaintiff's MSJ at 11–19.

[141] *See* 42 U.S.C. § 405(g); *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (explaining the credit-as-true rule "was intended as a rare and prophylactic

clearly established, it would still be unclear when, if ever, she improved to the point of no longer being disabled under the Act.

## V.    Conclusion

The Court affirms the ALJ's decision only to the extent it denied Plaintiff's Title II claim and Child's-Insurance-Benefits claim.  As to Plaintiff's Title XVI claim, the Court reverses the ALJ's decision and remands this matter for reevaluation of the record evidence and further explanation of the results in conducting the sequential evaluation process under 20 C.F.R. § 416.920(a).  If the ALJ again finds Plaintiff's symptom reports to be inconsistent with other evidence, the ALJ is instructed to explain such inconsistencies with specificity.  Likewise, if the ALJ again relies on improvement through medications and other treatment to discount Plaintiff's symptom reports, the ALJ shall articulate the relevant improvements, including the nature, degree, and timing of such improvements, and how they relate to Plaintiff's ability to sustain gainful employment.

Accordingly, **IT IS HEREBY ORDERED**:

1.    The case caption is to be **AMENDED** consistent with footnote 2.

2.    The decision of the ALJ is **AFFIRMED in part, REVERSED in part, and REMANDED**.

3.    Plaintiff's Motion for Summary Judgment, **ECF No. 13**, is **GRANTED in part and DENIED in part**.

---

exception to the ordinary remand rule when there is no question that a finding of disability would be required if claimant's testimony were accepted as true").

4.      The Commissioner's Motion for Summary Judgment, **ECF No. 15**, is

        **GRANTED in PART and DENIED in part**.

5.      The Clerk's Office shall enter **JUDGMENT** in favor of Plaintiff.

6.      The case shall be **CLOSED**.

        **IT IS SO ORDERED.**  The Clerk's Office is directed to file this Order and

provide copies to all counsel.

        **DATED** this 24th day of February 2022.


                        _____s/Edward F. Shea_____
                        EDWARD F. SHEA
                        Senior United States District Judge